MARINA PORTNOVA
Bar No. 206723
Email: MPortnova@lowenstein.com
**LOWENSTEIN SANDLER LLP**
390 Lytton Avenue
Palo Alto, CA 94301
Telephone: (650) 433-5720
Facsimile: (650) 433-5721

*Counsel for Foster Farms, LLC
and Foster Poultry Farms*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOSTER FARMS, LLC AND FOSTER POULTRY FARMS, <br><br> Plaintiffs, <br><br> v. <br><br> EVEREST NATIONAL INSURANCE COMPANY, <br><br> Defendant. | CASE NO. 21-cv-4356 <br><br> [Jury Demand Endorsed Hereon] |

## COMPLAINT AND JURY DEMAND

Plaintiffs Foster Farms, LLC ("Foster Farms") and Foster Poultry Farms ("Foster Poultry") (collectively "Foster"), by and through undersigned counsel, bring this action and allege as follows:

### NATURE OF THE CASE

1. This is an action against Defendant Everest National Insurance Company ("Everest") for breach of contract and declaratory judgment pursuant to 28 U.S.C § 2201.

COMPLAINT AND JURY DEMAND

Everest sold Foster a liability insurance policy with antitrust coverage but has denied any coverage obligation for three purported class action lawsuits that allege antitrust claims. *See Olean Wholesale Grocery Coop., et al. v. Agri Stats, et al.*, No. 1:19-cv-8318 (N.D. Ill. filed Dec. 19, 2019); *Sandee's Catering v. Agri Stats, et al.*, No. 1:20-cv-2295 (N.D. Ill. filed Apr. 13, 2020); *Gnemi, LLC v. Agri Stats, Inc.*, No. 1:20-cv-07371 (N.D. Ill. filed Dec. 11, 2020) (collectively "Turkey-Market Lawsuits"). Copies of the operative complaints are attached as Exhibits A, B and C.

2. Foster Farms and Foster Poultry are family-owned, family-managed companies with their headquarters in Livingston, California. They employ thousands of individuals in California and elsewhere in the United States.

3. Everest sold Private Company Liability Policy, Number PC8ML00004-191 (the "Policy") to Foster for the policy period May 7, 2019 to May 7, 2020 (the "Policy Period"). A true and correct copy of the Policy is attached as Exhibit D.

4. As part of the Antitrust Coverage Endorsement ("Antitrust Coverage") in the Policy, Everest agreed to provide broad coverage for antitrust claims. The Antitrust Coverage adds a $5 million limit for antitrust claims and deletes an exclusion in the Policy for claims "based upon, arising out of or attributable to an actual or alleged violation of" the antitrust laws.

5. The Turkey-Market Lawsuits allege, among other things, antitrust claims against Foster and other suppliers of turkey in connection with the sale and production of turkey. The claims in the Turkey-Market Lawsuits, therefore, fall within the Antitrust Coverage.

6. After receiving notice of the Turkey-Market Lawsuits, Everest denied coverage for any portion of Foster's defense and thereby breached its obligations under the Policy.

## PARTIES

7. Foster Poultry is a corporation organized under the laws of California with its principal place of business in California. Foster Poultry engages in the production of conventional, organic and antibiotic-free food products. Foster Poultry's portfolio offers a full variety of fresh, frozen and ready-to-eat products that meet clear consumer needs.

8. Foster Farms is a corporation organized under the laws of California with its principal place of business in California. Foster Farms, among other things, operates farms where it raises animals and sells livestock feed and feed ingredients to local dairies. None of Foster Farms' members are domiciled, have its principal place of business, or are incorporated in Delaware or New Jersey.

9. Defendant Everest is an insurance company organized under the laws of the State of Delaware with its principal place of business in New Jersey.

## JURISDICTION AND VENUE

10. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between Foster and Everest and the amount in controversy exceeds $75,000.

11. The Court has personal jurisdiction over Everest because the Policy covers Foster's business operations in California and was issued and/or delivered in California, and Foster's principal place of business and state of organization is California.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claim, including Everest's sale of the Policy, occurred in this District.

3

**COMPLAINT AND JURY DEMAND**

# FACTUAL ALLEGATIONS

**A.     The Policy Has Broad Antitrust Coverage**

13.     The Policy provides insurance coverage for the period May 7, 2019 to May 7, 2020.  Foster has paid hundreds of thousands of dollars in premiums to Everest and otherwise complied with all terms and conditions of the Policy.

14.     Everest drafted the Policy, including the Antitrust Coverage, using standard-form language that it filed with state insurance regulators and over which it claims a copyright.

15.     Under the Policy, Everest agreed that it would insure "all Loss for which the Company becomes legally obligated to pay on account of a Claim first made against the Company during the Policy Period . . . for a Wrongful Act."  Ex. D at 57 of 75 (Endorsement 17.)  Everest defined "Wrongful Act" to include "any actual or alleged error, misstatement, misleading statement, neglect, breach of duty, omission or act by the Company[.]"  Ex. D at 60 of 75 (Endorsement 17.)

16.     The term "Loss" is defined to include "Claim Expenses," which in turn is defined as "that part of a Loss consisting of the reasonable fees (including attorneys' fees and experts' fees) and expenses incurred by the Insureds (except any salaries, wages, overhead, benefits or benefit expenses associated with any Insured) in the investigation, defense or appeal of a Claim, including the premium for appeal, attachment or similar bonds (without any obligation by the Insurer to apply for or furnish such bonds)."  Ex. D at 51, 59 of 75 (Endorsement 16.)  Everest agreed in the Policy to "advance covered Claim Expenses within ninety (90) days after the receipt by the Insurer of properly detailed Claim Expenses invoices."  Ex. D at 12 of 75.

17.     In the body of the Policy, Everest drafted a comprehensive antitrust exclusion, which would have barred loss from Claims "based upon, arising out of or attributable to an actual or alleged violation of the Sherman Anti-Trust Act, the Clayton Act or the Federal Trade

Commission Act, as amended, or any other federal, state, local, common or foreign laws involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing, restraint of trade, unfair trade practices or tortious interference with another's actual or prospective business or contractual relationships or opportunities; provided this exclusion shall not apply to any Claim by one or more shareholders of the Company in their capacity as such" (the "Antitrust Exclusion").  Ex. D at 22 of 75.

18. For an additional premium, Everest added broad Antitrust Coverage through the addition of an endorsement. Ex. D at 71 of 75 (Endorsement No. 21).

19. Specifically, Everest agreed to pay up to a $5 million limit and to cover Foster for "all Loss for which the Company becomes legally obligated to pay on account of any Anti-Trust Claim first made against the Company during the Policy Period . . . ."  Ex. D at 71 of 75 (Endorsement No. 21).

20. Everest defined "Anti-Trust Claim" as "a Claim for violation of the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, as amended, or any other similar federal, state, local or foreign law involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or a violation of the Federal Trade Commission Act or any unfair or deceptive trade practices related to business competition, tortious interference in another's business or contractual relationships, anti-trust, monopoly, price fixing, price discrimination, or predatory pricing." *Id.*

21. As part of the Antitrust Coverage, Everest also agreed to delete the Antitrust Exclusion from the Policy.  Everest's intent in doing so was to make clear that antitrust claims were covered – not excluded – under the Policy.

22. Prior to selling the Policy, Everest completed a detailed review of Foster's operations and the potential risks in selling Foster liability insurance coverage.  In view of the

5
**COMPLAINT AND JURY DEMAND**

fact that companies in the food industry, including Foster, increasingly had been named in antitrust complaints alleging price fixing, Everest understood Foster was exposed to the potential risk of antitrust claims alleging price fixing activities.

**B.     The Turkey-Market Lawsuits Allege Antitrust Claims**

23.    Foster was first named as Defendants in the Turkey-Market Lawsuits during the Policy Period.  As such, the Turkey-Market Lawsuits were first made and/or are deemed to be made during the Policy Period.

24.    There were no antitrust actions pertaining to the turkey market filed against Foster before the Policy Period.

25.    The alleged classes in the Turkey-Market Lawsuits are persons who directly or indirectly purchased turkey from January 1, 2010 through January 1, 2017.  The plaintiffs assert claims against eleven companies that produce turkey (the "Turkey Producers") alleging that they conspired between January 1, 2010 and January 1, 2017 to suppress the supply of turkey and increase the price of turkey in the United States in violation of antitrust laws.

26.    The Turkey-Market Lawsuits contain claims that constitute "Antitrust Claims" within the meaning of the Policy.

27.    Coverage for the Turkey-Market Lawsuits is not barred by any exclusion in the Policy.

28.    Foster provided timely notice of the Turkey-Market Lawsuits to Everest and requested that Everest provide coverage under the Policy's Antitrust Coverage Endorsement.

**C.     Everest Refuses To Provide Insurance Coverage For The Turkey-Market Lawsuits**

29.    On June 3, 2020, Everest denied coverage for Foster's defense costs in the Turkey-Market Lawsuit.  A true and correct copy of Everest's denial letter is attached as Exhibit E.

30. In its denial, Everest asserted that the Turkey-Market Lawsuits were excluded from coverage under the "Specific Matter Exclusion." Ex. E.

31. The Specific Matter Exclusion uses standard-form language that Everest drafted and filed with state insurance regulators, including the California Department of Insurance, and over which it claims a copyright.

32. The Specific Matter Exclusion is confined in scope and applies only in limited circumstances involving three specific Events.

33. Specifically, the Specific Matter Exclusion provides as follows:

> The Insurer shall not be obligated to defend or be liable to pay Loss on account of any: (i) Claim based upon, arising out of, or attributable to any Events; (ii) investigation, defense, prosecution, adjudication, settlement, disposition or resolution of any Event(s); or (iii) any Claim alleging the same or substantially the same Wrongful Acts, Interrelated Wrongful Acts, facts, circumstances or situations underlying or alleged in any Events:
>
> **Events**
> -AIG Claim #501-519830-001 (Claimant: BROILER CHICKEN ANTITRUST)
> -AIG Claim #501-478035-001 (Claimant: ALEXANDER WONG)
> -Zurich Claim #9410555146 (Claimant: Fair Labor Standards Act)
>
> It is further understood and agreed that the Insurer shall not be obligated to defend or be liable for **Loss** on account of any **Claim** alleging, based upon, arising out of, or attributable to or in any way related directly or indirectly, in whole or in part, to an **Interrelated Wrongful Act** (as that term is defined below) regardless of whether such **Claim** involved the same or different claimants, the same or different **Insureds**, the same or different legal causes of action or is brought in the same or different venue or resolved in the same or different forum.
>
> For the purposes of this endorsement, the term **Interrelated Wrongful Act** means : (i) any fact, circumstance, act or omission alleged in any **Event(s)** and/or (ii) any **Wrongful Act** which is the same as, is similar or related to, or a repetition of, any **Wrongful Act** alleged in any **Event(s)**.

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.**

Ex. D at 50 of 75.

34. The three specified "Events" refer to claims numbers created by other insurance companies in connection with three previous claims files.

35. Everest asserts that Turkey-Market Lawsuits are related to "AIG Claim #501-519830-001 (Claimant: BROILER CHICKEN ANTITRUST)." AIG Claim #501-519830-001 (the "AIG Claim File") refers to a claim number established by National Union Fire Insurance Co. ("AIG"). The AIG Claim File contains Foster's insurance claim to AIG for the lawsuits consolidated as *In re Broiler Chicken Antitrust Litigation*, Case No. 16-cv-08637 (N.D. Ill.) ("Broiler Chicken Litigation") — litigation first commenced four years ago alleging, among other things, antitrust violations against the twenty largest chicken-producing companies in the United States pertaining to alleged anti-competitive conduct in the broiler-chicken market.

36. The Turkey-Market Lawsuits were not known to Foster before the Policy Period and, upon information and belief, are not part of AIG's Claim File.

37. As with any exclusion, Everest bears the burden of proving the Specific Matter Exclusion applies. Everest's denial is based on its contention that the Turkey-Market Lawsuits are related to the Broiler Chicken Litigation.

38. Everest has other language that it could have used if it intended to bar coverage for claims like those asserted in the Turkey-Class Action but it chose not. For example, Everest commonly adds broad exclusion to policies to bar coverage for all Claims alleging Wrongful Acts taking place prior to a policy's inception. Everest added no such exclusion to the Policy. Instead, Everest drafted the Specific Matter Exclusion and limited the exclusion to claims with a connection to three specified "Events."

39. Everest's denial does not explain how the claims at issue relate to an insurer's claim and ignores the numerous differences between the Turkey-Market Lawsuits and the Broiler Chicken Litigation.

40. The alleged objectives of the defendants in the Turkey-Market Lawsuits and the defendants in the Broiler Chicken Litigation are different. The Turkey-Market Lawsuits allege that the Turkey-Producing Defendants conspired to restrain the growth in the supply of turkey, which had the effect of increasing prices. Exs. A to C. By contrast, the Broiler Chicken Litigation contains allegations that the defendants conspired to fix, raise, maintain, and stabilize the price of Broilers.

41. The cases involve different markets and products – a fact emphasized by the underlying plaintiffs. The production and sale of turkey is completely different from the production and sale of chicken. The markets involve different producers, different actors, different production methods, and different pricing. Within Foster, there are different individuals responsible for turkey production and broiler chicken production. By contrast to broilers, Foster's whole-turkey segment is essentially a seasonal business with the vast majority of whole turkeys sold in November and December.

42. Given the different alleged conspiracies involving different markets with different production methods, the alleged antitrust schemes and conduct in the Turkey-Market Lawsuits and the Broiler Chicken Litigation also are distinct. The underlying plaintiffs in the Broiler Chicken Litigation allege a scheme by the defendants to violate competition laws by (1) destroying their own stock by destroying incubating eggs prior to hatching, breaking eggs prior to placement in the incubators, reducing the number of breeder chickens so that fewer eggs are laid, relying upon one another's production to meet customer needs, and exporting excess broiler chicken breeder flocks to Mexico; and (2) manipulating the Georgia Dock Price Index. The

plaintiffs in the Turkey-Market Lawsuits, on the other hand, allege a scheme by the defendants to violate competition laws by restraining the growth in the supply of turkey.

43. The cases involve different parties because different companies are involved in unrelated conduct. The three largest producers of turkey—Butterball, Jennie-O Turkey Store, and Cargill—do not have chicken operations and are not defendants in the Broiler Chicken Litigation. Pilgrim's Pride and Sanderson Farms—the second and third largest producers of broiler chickens——are defendants in the Broiler Chicken Litigation, but do not produce turkeys and therefore are not defendants in the Turkey-Market Lawsuits. Kraft Foods is a Turkey Defendant, but is a plaintiff in the Broiler Chicken Litigation.

44. In sum, the alleged conspiracy in the Turkey-Market Lawsuits is different from the alleged conspiracy in the Broiler Chicken Litigation, and alleges a separate agreement among different actors to share different information to further different objectives in a completely different manner.

45. Given the multiple differences between the Turkey-Market Lawsuits and the Broiler Chicken Litigation, the United States District Court overseeing the Turkey-Market Lawsuits held in denying a motion to transfer that the claims are not related.

46. On January 10, 2020, for tactical reasons, the Turkey Plaintiffs filed a motion to transfer the case to Judge Thomas M. Durkin, who presides over the Broiler Chicken Litigation. Everest relied heavily on the filing of this Motion in its denial letter. Ex. E at 2-3.

47. On November 3, 2020, Judge Virginia M. Kendall of the United States District Court of Northern District of Illinois presiding over the Turkey-Market Lawsuits denied the motion to transfer because the alleged antitrust schemes were "entirely distinct":

> This case and Broiler Chicken, although sharing some similarities in facts and parties, **cannot reasonably be classified as related** because they do not grow out of the same transaction or occurrence

> as required by Local Rule 40.4(a). . . . The cases are also not susceptible of disposition in a single proceeding because they allege **different facts about entirely different markets**. Adjudicating Plaintiffs' claims in this case will require the Court to 'weigh all of the circumstances of [the] case' including 'specific information about the relevant business,' the market structure, and purported market power of the defendants. . . . That inquiry in this turkey antitrust case is **entirely distinct** from the inquiry required in Broiler Chickens.

Ex. F at 1 (emphasis added).

48. Even with these major differences between the lawsuits and the trial court's ruling, Everest asserts that the Turkey-Market Lawsuits and Broiler Chicken Litigation are related presumably because both contain allegations pertaining to the sharing of information through a company called Agri Stats, Inc.

49. Agri Stats provides domestic and international customers in the chicken, turkey, commercial egg, and swine industries with reports to identify efficiency opportunities on a farm, flock, or plant level.

50. The Agri Stats reports at issue in the Broiler Chicken Litigation contain different data than the Agri Stats reports at issue in the Turkey-Market Lawsuits. The underlying plaintiffs in the Broiler Chicken Litigation allege that the Agri Stats reports at issue included "data on weighted average price, top third average, bottom third average, and volume traded on a daily, weekly, and monthly basis, and supply, sales volume by detailed product type and form, export, and pricing information for whole and cut-up Broilers." The underlying plaintiffs in the Turkey-Market Lawsuits allege, "Agri States issue[d] separate reports in the turkey industry to the integrator defendants regarding live operations, processing, further reprocessing, feed costs, and sales."

51. The separate Agri Stats reports at issue in the Broiler Chicken Litigation and the Turkey-Market Lawsuits are alleged to have been received by a completely different group of companies and utilized in a completely different manner.

52. The "Wrongful Acts" alleged in the Turkey-Market Lawsuits are not the receipt of information from Agri Stats, but the alleged agreement among producers of turkey to share information to raise prices.

53. There are allegations in the Turkey-Market Lawsuits that have nothing to do with Agri Stats. For example, the Turkey-Market Lawsuits allege that "[i]n addition to their participation in Agri Stats, defendant integrators had frequent opportunities to communicate, in conjunction with formal meetings of various trade associations." *See, e.g.,* Ex. A at ¶ 22. The Turkey-Market Lawsuits further allege that "the National Turkey Federation each year held regular meetings, including the NTF Annual Convention and the NTF Leadership conference, which were widely attended by the defendant integrators." *See, e.g.,* Ex. A at ¶ 22. The complaints in the Turkey-Market Lawsuits also contain sections labeled "Defendants had numerous opportunities to collude" setting forth various meetings, events, and trade associations during which the plaintiffs allege defendants may have conspired to cut production and increase pricing. *See, e.g.,* Ex. A at 41-42. These allegations are unique to the Turkey-Market Lawsuits and are not in the Broiler Chicken Litigation.

54. Further, the Policy contains an Allocation Provision that contemplates claims could covered and uncovered matters. Ex. D at 11 of 75. That provision provides that, "if in any Claim under the Liability Coverage Parts the Insureds incur both Loss covered by this policy and loss not covered by this policy . . . because the Claim against the Insureds includes both covered and uncovered matters . . . , the Insureds and the Insurer shall use their best efforts to allocate such amount between covered Loss and uncovered loss based upon the relative legal and

financial exposures of the parties to covered and uncovered matters." *Id.* Everest has not acknowledged any portion of the claim is covered and has not offered any allocation to Foster.

55. At a minimum, the Policy is ambiguous because it provides broad Antitrust Coverage and a Specific Matter Endorsement with unclear parameters.

## CAUSES OF ACTION

### COUNT I
### Declaratory Judgment – Duty to Defend

56. Foster incorporates by reference each of the allegations in paragraphs 1 through 55 into Count I.

57. The Policy is a valid and enforceable contract.

58. Everest has a coverage obligation for the defense of any claim brought against Foster that is made and reported during the Policy Period and that potentially falls within the coverage of the Policy.

59. The Turkey-Market Lawsuits were first made against Foster and reported to Everest during the Policy Period.

60. The Turkey-Market Lawsuits against Foster fall, or potentially fall, within the coverage of the Policy.

61. Everest asserts that the Specific Matter Exclusion precludes all coverage. The exclusion does not apply.

62. The Policy obligates Everest to pay Foster's defense costs in the Turkey-Market Lawsuits.

63. Everest has denied any defense obligation for the Turkey-Market Lawsuits.

64. Accordingly, pursuant to 28 U.S.C. § 2201, there is an actual and justiciable controversy concerning whether Everest has a defense obligation for the Turkey-Market

Lawsuits and whether the Specific Matter Exclusion bars coverage for the Turkey-Market Lawsuits. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Foster seeks a declaration that the Policy obligates Everest to fully fund Foster's defense for the Turkey-Market Lawsuits and that the Specific Matter Exclusion does not apply.

### COUNT II
### Breach of Contract

65. Foster incorporates by reference each of the allegations in paragraphs 1 through 55 into Count II.

66. The Policy is a valid and enforceable contract.

67. Under the Policy, Everest agreed to pay Foster's defense costs.

68. The Turkey-Market Lawsuits contain or potentially contain covered claims under the Policy.

69. Everest refused to provide defense coverage to Foster for the Turkey-Market Lawsuits and thereby breached its contractual obligations to Foster.

70. Foster has suffered, and continues to suffer, damages because of Everest's breach.

### PRAYER FOR RELIEF

WHEREFORE, the Foster prays for relief as follows:

1. Judgment on Count I of this Complaint declaring that Everest has a duty to advance 100% of Foster's defense costs above the $1 million retention in the Antitrust Coverage and declaring the exclusion asserted by Everest does not apply.

2. Judgment on Count II of this Complaint for breach of contract and awarding damages in an amount to be proven;

    3.    Pre- and post-judgment interest against Everest; and

    4.    For such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Foster demands a trial by jury on all issues triable by a jury.

Dated: June 8, 2021

Respectfully Submitted,

*/s/ Marina Portnova*

MARINA PORTNOVA
Bar No. 206723
**LOWENSTEIN SANDLER LLP**
390 Lytton Avenue
Palo Alto, CA 94301
Telephone: (650) 433-5720
Facsimile: (650) 433-5721
Email: MPortnova@lowenstein.com

*Counsel for Foster Farms, LLC and Foster Poultry Farms*

*Of Counsel*
Andrew M. Reidy (pro hac vice motion to be filed)
Joseph M. Saka (pro hac vice motion to be filed)
Lowenstein Sandler LLP
2200 Pennsylvania Avenue, NW
Suite 500E
Washington, DC 20037
202.753.3800
973.597.6193 (fax)
areidy@lowenstein.com
jsaka@lowenstein.com