1
2
3
4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   FOSTER FARMS, LLC, et al.,              Case No.  3:21-cv-04356-WHO

8                      Plaintiffs,
                                            **ORDER ON CROSS MOTIONS FOR**
9            v.                             **SUMMARY JUDGMENT**

10  EVEREST NATIONAL INSURANCE              Re: Dkt. Nos. 57, 58
    COMPANY,
11
                       Defendant.
12

13          This is an insurance coverage dispute between plaintiffs Foster Farms, LLC, and Foster

14  Poultry Farms (collectively, "Foster") and defendant Everest National Insurance Company

15  ("Everest").  After Foster was sued for alleged antitrust violations concerning its chicken products,

16  Foster purchased insurance from Everest that covered antitrust claims but precluded coverage of

17  claims related to the chicken antitrust suits.  Subsequently, Foster was sued for alleged antitrust

18  violations concerning its turkey products.  Foster filed a claim with Everest for insurance coverage

19  of the turkey antitrust suits, but Everest denied the claim, citing the exclusion provision for the

20  chicken suits.  Foster filed suit in this court, seeking declaratory judgment that the policy covers

21  the turkey antitrust claims, and Everest filed a counterclaim seeking the opposite.  The parties filed

22  cross motions for summary judgment to resolve this question.  For the following reasons, I find

23  that the relevant provision does not preclude coverage of the turkey antitrust suits.

24                                    **BACKGROUND**

25  **I.      FACTUAL BACKGROUND**

26          **A.  The Chicken Antitrust Suits**

27          In 2016, Foster was insured by National Union Fire Insurance Company ("AIG"),

28  Declaration of Joseph Saka ("Saka Decl.") [Dkt. No. 58] Ex. 22 at 34:14-20, when it was named

as a defendant in various antitrust lawsuits brought on behalf of direct and indirect purchasers of broiler chickens[1] ("Broilers"), Direct Purchaser Complaint ("DPC") [Dkt. No. 17] Ex. 1; Indirect Purchaser Complaint ("IPC") [Dkt. No. 17] Ex. 2.  The suits were consolidated in the Northern District of Illinois as *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-8637 (N.D. Ill. 2020) ("Chicken Antitrust Suits").  [Dkt. No. 17] Exs. 1, 2.  The direct purchaser plaintiffs[2] allege violations of 15 U.S.C. § 1 ("the Sherman Act"), and the indirect purchasers[3] allege violations of § 1 of the Sherman Act, violations of state antitrust laws, violations of state consumer protection laws, and unjust enrichment.  DPC ¶¶ 362-72; IPC ¶ 250.

The Chicken Antitrust Suits allege that the twenty largest chicken producers in the U.S., including Foster, engaged in anticompetitive conduct by conspiring to coordinate output and limit Broiler production with the goal of increasing prices and profitability for U.S. chicken producers. DPC ¶¶ 1, 362-72; IPC ¶¶ 1, 250.  In furtherance of this goal, the suits assert that the defendants conspired with a data analytics service provider called Agri Stats, Inc. ("Agri Stats"), which produced confidential industry reports containing "detailed, competitively sensitive, and closely-guarded non-public information" from the defendant chicken producers, including specific data on pricing, volume, supply, and exports.  DPC ¶¶ 1, 92; IPC ¶¶ 1, 102.  The allegations state that Agri Stats reports were not publicly available, were more detailed than public reports, and were provided only to participating defendant-producers in exchange for fees and detailed information regarding their operations.  DPC ¶¶ 92-93; IPC ¶ 102-3.

Each defendant allegedly received multiple types of Agri Stats reports, including ones concerning individual areas of operations, such as "breeding, hatching, hauling, feeding,

---

[1] Broilers "are chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards."  [Dkt. No. 17] Ex. 1 ¶ 74; [Dkt. No. 17] Ex. 2 ¶ 84.

[2] Direct purchasers are "persons who purchased Broilers directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States."  DPC at 1.

[3] Indirect purchasers are "persons and entities who purchased Broilers indirectly from a Defendant or co-conspirator for use or delivery in the United States."  IPC at 1.

processing, selling, and administration." DPC ¶ 101; IPC ¶ 111.  Agri Stats also provided a more detailed monthly "Bottom Line Report" to the defendants' CEOs, CFOs, and other top executives, which contained data for participating producers' profits, overhead, interest, and "other key operation information." DPC ¶ 102; IPC ¶ 112.  The suits allege that some chief executives specifically referred to these reports when making business decisions.  *See* DPC ¶ 106; IPC ¶ 116.

According to the allegations, the defendants and Agri Stats repeatedly met at quarterly meetings to present company and industry-wide data.  DPC ¶ 103; IPC ¶ 113.  Agri Stats led "detailed discussions about industry profitability" and other key metrics and told "company executives how much the industry was over- or undersupplying the market, indicate[d] its estimate of demand, and share[d] other information based on the data Defendants provided."  DPC ¶ 103; IPC ¶ 113.  The suits also allege that the defendants had numerous other opportunities to collude with each other and via Agri Stats through participation in trade associations, investor conferences, tours of competitors' plants, and discussions regarding mergers, acquisitions, and capital financing.  DPC ¶¶ 270-90; IPC ¶¶ 280-300.

Though the reports were anonymized, they were allegedly sufficiently detailed such that "a reasonably informed producer" could discern competitors' identities, and it was "common knowledge" that competitors—namely their knowledgeable top executives—did so by "reverse engineering" the report data.  DPC ¶ 100-102; IPC ¶ 110-12.  To the extent that companies were not able to identify their competitors' data from Bottom Line Reports, they could clarify during meetings with Agri Stats, when Agri Stats confirmed identities.  DPC ¶ 103; IPC ¶ 113.

The Chicken Antitrust Suits allege that the reports and communications allowed the defendants-producers to share confidential and proprietary information to reduce competition, constrain supply, and create pretext for industry-wide production cuts.  *See* DPC ¶ 112; IPC ¶ 122.

Between 2008-2009 and 2011-2012, the defendants allegedly engaged in both short- and long-term production cuts to reduce Broiler supply.  DPC ¶¶ 118, 171; IPC ¶¶ 128, 175.  Short-term cuts included typical measures from which producers could recover in a matter of weeks, such as destroying eggs, killing and reducing the number of chicks, limiting processing plant capacity, and exporting eggs and chicks.  DPC ¶¶ 116-17; IPC ¶¶ 126-27.  Both the 2008-2009

and 2011-2012 production cuts also involved "unprecedented" long-term cuts to breeder stocks that "went further up their supply chains than ever before," DPC ¶ 165; IPC ¶ 175, including retiring and killing off breeder flocks and reducing purchases of breeder pullets, DPC ¶¶ 116-17, 214; IPC ¶¶ 126-27, 224. The long-term cuts could affect production for "a period of years." DPC ¶ 116; IPC ¶ 126. During the 2011-2012 cuts, the defendants allegedly made direct purchases from each other to meet their sales needs despite reducing their own production, which allowed them to act "as though [the cuts] were for a single unified company, rather than competing businesses." DPC ¶ 313; IPC ¶ 323.

The Chicken Antitrust Suits also contain allegations about the Broiler market and industry. They allege that the Broiler industry is vertically integrated, DPC ¶ 243; IPC ¶ 253, and that supply and demand are inelastic, DPC ¶ 252; IPC ¶ 262, in part because purchasers often cannot forgo purchasing in the face of increasing prices, and in part because consumers do not substitute chicken for other proteins, DPC ¶¶ 114, 255; IPC ¶¶ 124, 265. The suits also assert that the entire industry uses similar cost structures, including the use of publicly available "spot prices," and that feed is the largest cost component. DPC ¶¶ 11, 299-300; IPC ¶¶ 11, 309-310.

Finally, the suits allege that the coordinated production cuts and the resulting increases in Broiler prices were due to defendant's anticompetitive behavior rather than market forces. DPC ¶¶ 10-12; IPC ¶¶ 10-12. To support this, the complaints explain how decreases in the price of feed costs—corn and soybean meal—led to increases, rather than decreases, in the price of Broilers. DPC ¶¶ 300-302; IPC ¶¶ 310-312.

The Chicken Antitrust Suits allege that, as a result of the conspiracy:

A.    Price competition has been restrained or eliminated with respect of Broilers;
B.    The prices of Broilers have been fixed, raised, stabilized, or maintained at artificially inflated levels; and
C.    Purchasers of Broilers have been deprived of free and open competition.

DPC ¶ 339; IPC ¶ 350.

**B.  The Turkey Antitrust Suits**

After entering a new insurance contract with Everest, as outlined below, Foster was named in three antitrust lawsuits brought against turkey producers (the "Turkey Antitrust Suits"): *Olean*

4

*Wholesale Grocery Coop.*, *et al. v. Agri Stats, et al.*, No. 1:19-cv-8318 (N.D. Ill. filed Dec. 19, 2019), a putative class action of direct turkey purchasers ("Olean"), Complaint [Dkt. No. 6] ("Compl.") Ex. A ¶¶ 47-48; *Sandee's Catering v. Agri Stats, et al.*, No. 1:20-cv-2295 (N.D. Ill. filed Apr. 13, 2020), a putative class action of indirect turkey purchasers ("Sandee's"), Compl. Ex. B ¶¶ 47-48; and *Gnemi LLC v. Agri Stats, Inc. et al.*, No. 1:20-cv-07371 (N.D. Ill. filed Dec. 11, 2020) ("Gnemi"), Compl. Ex. C ¶¶ 47-48.[4]  The cases were later consolidated with additional antitrust suits regarding the turkey market.[5]

The Turkey Antitrust Suits were filed against a group of turkey producers that allegedly controls 80 percent of the wholesale turkey market in the U.S.  Olean ¶ 1; Sandee's ¶ 1.  The suits assert causes of action under § 1 of the Sherman Act, as well as state antitrust, consumer protection, and unjust enrichment laws and doctrine.  Olean ¶¶ 146-63; Sandee's ¶¶ 146-232.  The complaints allege that Foster and other defendants conspired to raise and fix prices by exchanging information regarding turkey production and sale through Agri Stats, with the goal of increasing profitability in the market.  Olean ¶¶ 3, 11; Sandee's ¶¶ 3, 11.

The Turkey Antitrust Suits allege that defendants subscribed to Agri Stats and received monthly reports much like those in the Chicken Antitrust Suits.  Olean ¶¶ 10, 74; Sandee's ¶¶ 10, 73.  The reports allegedly contained information specific to turkey producers, "including information on profits, prices, costs, and production levels," as well as information on "industry-wide supply levels," "breeder flock and hatchery data," and "growout flocks."  Olean ¶¶ 10,16; Sandee's ¶¶ 10, 16.  The suits assert that the turkey reports included similar data as the reports in the Chicken Antitrust Suits, such as "the number of broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, 'down time'), feed conversion rate . . . , and daily average weight."  Olean ¶ 17; Sandee's ¶ 17.  The

---

[4] The *Gnemi* suit was voluntarily dismissed in January 2021, [Dkt. No. 17] Ex. 3, and I do not cite it further in this Order.

[5] The "Turkey Antitrust Suits" refer to the *Olean*, *Sandee's*, and *Gnemi* suits for the purposes of this coverage dispute.  The consolidated cases also included *Winn-Dixie Stores, Inc. v. Agri Stats, Inc.*, No. 1:21-cv-04131 (N.D. Ill. filed Aug. 3, 2021), Saka Decl. Ex. 16, and *Armory Investments LLC v. Agri Stats, Inc.*, No. 1:21-cv-06600 (N.D. Ill. filed Dec. 9, 2021), Saka Decl. Ex. 17.

reports allegedly provided information that allowed the defendant-producers to compare "performance, sales prices, and costs to other participants." Olean ¶ 75; Sandee's ¶ 74.

The Agri Stats reports were available to participating turkey producers, but not to the public or purchasers. Olean ¶¶ 10, 88; Sandee's ¶¶ 10, 87. To access the reports, companies were required to pay fees and provide company data. Olean ¶ 10; Sandee's ¶ 10.

The reports were allegedly provided to sales personnel, "top management and executives," and finance executives. Olean ¶¶ 13-15, 19; Sandee's ¶¶ 13-15, 19. Various defendants allegedly used the reports to evaluate items, prices, and distribution in relation to other producers, and to set prices, and improve returns. Olean ¶¶ 13-15, 19; Sandee's ¶¶ 13-15, 19.

Although the Agri Stats reports were anonymous, the complaints allege that the defendants could "deanonymize" them and "identify the data of specific companies based on their industry knowledge." Olean ¶ 18; Sandee's ¶ 18.

In addition to using Agri Stats data to collude, the Turkey Antitrust Suits allege that the defendants' "top-level executives . . . discuss[ed] topics with one another relating to pricing, production, and other non-public proprietary information" during informal meetings at turkey conferences, which "g[ave] CEOs and top-level executives comfort that their competitors remain committed to a plan to artificially restrict turkey production." Olean ¶ 127; Sandee's ¶ 126. The defendants also allegedly communicated through membership in trade councils and associations. Olean ¶¶ 128-29; Sandee's ¶¶ 127-28.

The Turkey Antitrust Suits generally allege that the turkey producers "exercise[d] a remarkable level of industry-wide restraint in keeping the growth of turkey supply in check" and that the defendant-producers "acted in a concerted way to decrease turkey supply." Olean ¶¶ 20, 108; Sandee's ¶¶ 20, 107. They also assert that the defendants engaged in coordinated production cuts in 2009, 2013, 2014, and 2015. Olean ¶¶ 108-16; Sandee's ¶¶ 107-15. The abnormal pricing allegedly ceased shortly after and in response to the filing of the Chicken Antitrust Suits in 2016. Olean ¶¶ 31, 110; Sandee's ¶¶ 31, 109.

Finally, the complaints outline characteristics of the turkey market, including that it is vertically integrated with high barriers to entry, making it susceptible to anticompetitive behavior.

Olean ¶ 93, 96; Sandee's ¶ 92. Additionally, they assert that there are few sellers in the market and that the defendants control approximately 80 percent of production and processing. Olean ¶ 102; Sandee's ¶ 101. Turkey is also a "fungible" product, which supports price uniformity between producers, but turkey is not easily substituted for other products. Olean ¶¶ 103, 106-07; Sandee's ¶¶ 102, 105-06. Demand for turkey products is inelastic and consumer demand does not change significantly in response to changes in price. Olean ¶ 106; Sandee's ¶ 105.

The Turkey Suits further allege that as a result of the defendant turkey producers' conspiracy:

> A. Price competition has been restrained or eliminated with respect to turkey;
> B. The prices of turkey have been fixed, raised, stabilized, or maintained at artificially inflated levels;
> C. [P]urchasers of turkey have been deprived of free and open competition; and
> D. [P]urchasers of turkey . . . paid artificially inflated prices.

Olean ¶ 141; Sandee's ¶ 141.

### C. The Policy

#### 1. Policy Negotiations

In 2017, Foster sought to transfer its insurance coverage from AIG. Declaration of Patrick Sklarski ("Sklarski Decl.") [Dkt. No. 57] Ex. 1 ¶ 3; Declaration of Dustin Feeny ("Feeny Decl.") [Dkt. No. 58] Ex. 1 ¶ 7. Foster's insurance broker, Lockton, solicited quotes for directors' and officers' ("D&O") insurance coverage. Feeny Decl. ¶ 7. Foster specifically sought a policy that would provide coverage for antitrust suits because it identified a trend of "food companies increasingly being named in suits alleging antitrust violations." *Id.* ¶¶ 5, 8.

In April 2017, Lockton began negotiating with Everest for Foster's liability insurance coverage, including coverage for antitrust claims. Sklarski Decl. ¶ 3. Everest provided Lockton with its Private Company Liability Proposal, which included antitrust coverage. *Id.* Ex. B. Because Everest was aware of the pending Chicken Antitrust Suits against Foster, the proposal included a Specific Matter Exclusion ("SME") that precluded coverage for liability related to the Chicken Antitrust Suits, as well as two other "events." *Id.* ¶ 5; *id.* Ex. B at 86.

Subsequently, Everest issued a Private Company Liability Policy to Foster for the period of May 7, 2018, to May 7, 2019. *Id.* ¶ 8; *id.* Ex. D at 50. Everest renewed the 2018-2019 policy

United States District Court
Northern District of California

for the period May 7, 2019, to May 7, 2020, without any changes to the Antitrust Coverage Endorsement or the SME.  Saka Decl., Ex. 22 at 97:8-14; Sklarski Decl. ¶ 9; *see generally* Private Company Liability Policy ("Policy") [Dkt. No. 6] Ex. 4.

### 2.   Relevant Policy Terms

The Policy provides, among other things, Management and Company Liability coverage for Foster for the policy period May 7, 2019, to May 7, 2020.  *See* Compl. Ex. 4.  The Insuring Clauses of the Management and Company Liability Part provide, in relevant part, that Everest "shall pay on behalf of [Foster] all Loss for which [Foster] becomes legally obligated to pay on account of a Claim first made against [Foster] during the Policy Period or the Extended Reporting Period, if exercised, for a Wrongful Act."  Policy at 17, as modified by Endorsement No. 17.  For the purposes of the Company Liability Coverage, a "Wrongful Act" is defined as "any actual or alleged error, misstatement, misleading statement, neglect, breach of duty, omission or act by the Company."  *Id.* at 60, Endorsement No. 17.

To provide antitrust coverage, Everest removed its standard antitrust exclusion from the D&O policy form and added a form antitrust endorsement.[6]  Saka Decl., Ex. 22 at 59:21-60:18; *see* Sklarski Decl. Ex. B at 85.  The antitrust endorsement adds to the Insuring Clause:

> E.   ANTI TRUST COVERAGE
> The Insurer shall pay on behalf of the **Company**, all **Loss** for which the **Company** becomes legally obligated to pay on account of any **Anti-Trust Claim** first made against the **Company** during the **Policy Period** or the **Extended Reporting Period,** if exercised, for a **Wrongful Act** taking place before or during the **Policy Period**, subject to a maximum limit of liability of $5,000,000, which is part of and not in addition to the applicable Limits of Liability set forth in Items 2 and 6 of the Declarations.

Policy, Insuring Clause § I.E, as modified by Endorsement No. 21.  Antitrust claims include violations of the Sherman Act.  *Id.* at 71, Endorsement No. 21.

The Policy also contains the SME, which provides:

> The Insurer shall not be obligated to defend or be liable to pay **Loss**

---

[6] The standard exclusion barred coverage of Claims "based upon, arising out of or attributable to an actual or alleged violation of the Sherman Anti-Trust Act" and other state and federal laws involving antitrust, price fixing, unfair trade practices, and other similar claims.  Policy § IV.L.5, as amended by Endorsement No. 21.

United States District Court
Northern District of California

on account of any: (i) **Claim** based upon, arising out of, or attributable to any **Events**; (ii) investigation, defense, prosecution, adjudication, settlement, disposition or resolution of any **Event(s)**; or (iii) any **Claim** alleging the same or substantially the same **Wrongful Acts**, **Interrelated Wrongful Acts**, facts, circumstances or situations underlying or alleged in any **Events**:

**Events**

AIG Claim #501-519830-001 (Claimant: BROILER CHICKEN ANTITRUST)
AIG Claim #501-478035-001 (Claimant: ALEXANDERWONG)
Zurich Claim #9410555146 (Claimant: Fair Labor Standards Act)

It is further understood and agreed that the Insurer shall not be obligated to defend or be liable for **Loss** on account of any **Claim** alleging, based upon, arising out of, or attributable to or in any way related directly or indirectly, in whole or in part, to an **Interrelated Wrongful Act** (as that term is defined below) regardless of whether such **Claim** involved the same or different claimants, the same or different **Insureds**, the same or different legal causes of action or is brought in the same or different venue or resolved in the same or different forum.

For the purposes of this endorsement, the term **Interrelated Wrongful Act** means: (i) any fact, circumstance, act or omission alleged in any **Event(s)** and/or (ii) any **Wrongful Act** which is the same as, is similar or related to, or a repetition of, any **Wrongful Act** alleged in any **Event(s)**.

*Id.* at 50, Endorsement No. 15.  The Policy excludes coverage for any claim "based upon, arising out of, or attributable to any fact, circumstance or Wrongful Acts which have been the subject of any written notice given and accepted under any prior directors and officers, management liability or comparable insurance policy or coverage part." *Id.* Management and Company Liability Coverage Part, Exclusions § IV, as modified by Endorsement No. 17.

The Policy does not include duty to defend coverage for the Management and Company Liability Coverage Part.  *See* Policy at 2, Item 6.[7]

---

[7] The Policy provides:

1. If duty to defend coverage is purchased with respect to any **Liability Coverage Part** as designated in the Coverage Schedule in Item 6 of the Declarations, the Insurer shall have the right and duty to defend any **Claim** covered under such **Liability Coverage Part**, even if any of the allegations are groundless, false or fraudulent. The Insurer's duty to defend any **Claim** shall cease upon exhaustion of the Limit of Liability applicable to such **Claim**.

2. If duty to defend coverage is not purchased with respect to any **Liability Coverage Part** as designated in the Coverage Schedule in Item 6 of the Declarations, it shall be the duty of the **Insureds**

9

1

2

**D. Denial of Coverage**

3        In January 2020, Foster notified Everest of *Olean*.  Saka Decl. Ex. 8; Declaration of James

4   Mandarino ("Mandarino Decl.") [Dkt. No. 57].  In April 2020, Everest initially denied coverage

5   for the Turkey Antitrust Suits, informing Foster that coverage was precluded by the Policy's SME.

6   *See* Mandarino Decl. ¶ 4.  Foster requested reevaluation.  *See* Saka Decl. Ex. 2.  After reviewing

7   Foster's concerns, Everest reiterated its determination that the SME applied and precluded

8   coverage for the Turkey Antitrust Suits.  *See* Letter Denying Coverage ("Denial Letter") [Dkt. No.

9   6] Ex. E.[8]

10  **II.    PROCEDURAL BACKGROUND**

11        Foster filed this suit in June 2021, alleging breach of contract and seeking declaratory

12  judgment that the SME does not apply to the Turkey Antitrust Litigation and that Everest must

13  advance Foster's defense costs.  Complaint ("Compl.") [Dkt. No. 6] 14:22-24.  In August 2021,

14  Everest filed its answer and a counterclaim, seeking declaratory judgment that the Policy does not

15  afford coverage for the Turkey Antitrust Suits and that Everest has no duty to defend or advance

16  costs for the Turkey Antitrust Suits.  [Dkt. No. 17] 32:3-9.

17        In January 2023, Everest moved for summary judgment Foster's claims and its own

18  counterclaim.  ("D. Mot.") [Dkt. No. 57] 1:3-9.  Foster cross-moved for partial summary judgment

19  on the declaratory judgment claims.  ("P. Mot.") [Dkt. No. 58] 1:3-9.  Foster and Everest timely

20

21                    and not the duty of the Insurer to defend any **Claim** covered under
                      such **Liability Coverage Part**.  Solely with respect to such
22                    **Liability Coverage Part**, the Insurer shall advance covered
                      **Claim Expenses** within ninety (90) days after the receipt by the
23                    Insurer of properly detailed Claim Expenses invoices. Any
                      advancement of covered **Claim Expenses** shall be repaid to the
24                    Insurer by the **Insureds** severally according to their respective
                      interests if and to the extent it is later determined the **Insureds**
25                    shall not be entitled under the terms and conditions of this policy
                      to coverage for such **Claim Expenses**.
26
    Policy at 12, Company Liability Policy General Terms and Conditions § VII.A.1-2.
27
    [8] It is not clear from the parties' filings when Everest was made aware of *Sandee's* and *Gnemi*, but
28  the letter denied coverage for all three turkey suits that existed at the time.  *See* Denial Letter.

filed their respective oppositions and replies.  ("D. Oppo.") [Dkt. No. 60]; ("P. Oppo.") [Dkt. No. 61]; ("D. Repl.") [Dkt. No. 64]; ("P. Repl.") [Dkt. No. 65].  I held a hearing on April 12, 2023, at which counsel for both parties appeared.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial."  *Id.* at 324.  The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, all reasonable factual inferences are drawn in favor of the non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

At issue in this case is whether the SME precludes coverage for the Turkey Antitrust Suits.  The exclusion precludes coverage for claims (1) "based upon, arising out of, or attributable to" the Chicken Antitrust Suits or an Interrelated Wrongful Act; (2) "alleging the same or substantially the same Wrongful Acts, Interrelated Wrongful Acts, facts, circumstances or situations underlying or alleged in" the Chicken Antitrust Suits; and (3) "in any way related directly or indirectly, in whole or in part, to an Interrelated Wrongful Act" in the Chicken Antitrust Suits "regardless of whether such Claim involved" different claimants, insureds, causes of actions, venues, or fora.

11

Policy, Endorsement No. 15.  An "Interrelated Wrongful Act" is defined as "any fact, circumstance, act or omission alleged in" the Chicken Antitrust Suits or any act that is "the same as, is similar or related to, or a repetition of" any wrongful act alleged in the Chicken Antitrust Suits.  *Id.*

Everest argues that the Turkey Antitrust Suits are subject to the SME because they allege substantially the same underlying facts and circumstances or, alternatively, arise out of or are attributable to the facts and circumstances alleged in the Chicken Antitrust Suits.  Foster argues that the lawsuits are not related because they involve different markets, objectives, schemes, classes of plaintiffs, and underlying alleged acts.

# I.    PRINCIPLES OF CONTRACT INTERPREATION

As an initial matter, jurisdiction in this case is based on diversity, and neither party disputes that the construction of the Policy is governed by California law.  *See Integon Nat'l Ins. Co. v. Reece*, 423 F. Supp. 3d 831, 840 (E.D. Cal. 2019) (applying California law of contract interpretation in an insurance case heard under diversity jurisdiction).

"California courts interpret insurance contracts under the 'ordinary rules of contractual interpretation.'"  *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (quoting *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 988 P.2d 568, 652 (1999)).  The "fundamental rule[] of contract interpretation" is that the "contract must give effect to the 'mutual intention' of the parties."  *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647, 73 P.3d 1205 (2003) (citations omitted); *see also* Cal. Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.").  Where possible, courts determine the parties' mutual intent "solely from the written provisions of the insurance policy," *L.A. Lakers*, 869 F.3d at 801 (quoting *Palmer*, 988 P.2d at 652), to ascertain the "plain meaning" of the language, *Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*, 59 Cal. 4th 277, 288, 326 P.3d 253, 259 (2014) (quoting *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18, 900 P.2d 619 (1995)).  The language is given its "clear and explicit meaning," interpreted in its "ordinary and popular sense," looking to "the meaning a layperson would ordinarily attach to it."  *Id.* (citations omitted).  "[I]f the meaning a lay person would

1   ascribe to the contract language is not ambiguous, [courts] apply that meaning." *Pension Tr. Fund*

2   *for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 950 (9th Cir. 2002) (quoting *AIU Ins. Co. v.*

3   *Superior Ct.*, 51 Cal. 3d 807, 822, 799 P.2d 1253 (1990)).

4   　　　"[T]o determine whether an ambiguity exists," "[t]he policy must be examined as a whole,

5   and in context." *Minkler v. Safeco Ins. Co. of Am.*, 49 Cal. 4th 315, 322, 232 P.3d 612, 616

6   (2010), *opinion after certified question answered sub. nom. Minkler v. Safeco Ins. Co.*, 399 F.

7   App'x 230 (9th Cir. 2010) (citation omitted); *see also Westport Ins. Corp. v. N. Cal. Relief*, 76 F.

8   Supp. 3d 869, 878 (N.D. Cal. 2014) (noting that resolution of ambiguity is a question of law).

9   Insurance contract terms are ambiguous if they are "susceptible [to] more than one reasonable

10   interpretation." *Minkler*, 232 P.3d at 617.  If a term is ambiguous, it should be "interpret[ed] to

11   protect the objectively reasonable expectations of the insured." *Id.* at 616 (internal citation and

12   quotation marks omitted).  Basic coverage provisions follow this general rule and "are construed

13   broadly in favor of affording protection," while "clauses setting forth specific exclusions from

14   coverage are interpreted narrowly against the insurer." *Id.*; *see also Kunde Enters., Inc. v. Nat'l*

15   *Sur. Corp.*, 608 F. Supp. 3d 883, 892 (N.D. Cal. 2022) (same).

16   　　　Additionally, to give effect to an exclusion clause, the language must be "clear and

17   unmistakable" and "understandable from the standpoint of a layperson," not merely unambiguous.

18   *Kunde Enters.*, 608 F. Supp. 3d at 892 (quoting *MacKinnon*, 31 Cal. 4th at 648).  The insurer has

19   the burden "to phrase exceptions and exclusions" in a clear and understandable way. *Id.* (quoting

20   *MacKinnon*, 31 Cal. 4th at 648).

21   　　　Finally, as the insured, Foster has the initial burden to demonstrate that the conduct

22   forming the basis for the claim falls within the within the basic scope of the insurance policy.

23   *Waller*, 11 Cal. 4th at 16.  Foster has done so by pointing to the Policy's broad coverage for

24   antitrust claims.  *See* Policy, Insuring Clause § I.E, as modified by Endorsement No. 21.  The

25   burden now shifts to Everest to prove that the claim is excluded under a provision of the policy.

26   *See Waller*, 11 Cal. 4th at 16.; *see also Raychem Corp. v. Fed. Ins. Co.*, 853 F. Supp. 1170, 1175

27   (N.D. Cal. 1994) ("[T]he insurer bears the burden at trial of proving that a statutory or policy

28

United States District Court
Northern District of California

13

1  exclusion or limitation applies.").[9]

2  **II.     THE SME IS NOT AMBIGUOUS**

3  First, I assess whether the SME is ambiguous.  The parties address each phrase in the SME

4  together but because the terms "based upon," "same," "related to," and others have distinct

5  meanings and applications, I address each of these sections of the SME in turn.

6  **A.  Based Upon, Arising Out Of, or Attributable To**

7  First, I assess whether the SME provision excluding claims that are "based upon, arising

8  out of, or attributable to" the Chicken Antitrust Suits or interrelated wrongful acts is ambiguous.

9  *See Pension Tr. Fund*, 307 F.3d at 950.  If it is not ambiguous, I assign to the provision its plain

10  meaning, *Hartford Cas. Ins. Co.*, 326 P.3d at 259, based on the parties' mutual intent, *L.A. Lakers*,

11  869 F.3d at 801.

12  In insurance contracts, the clause "arising from" is "consistently given a broad

13  interpretation" and "broadly excludes from coverage claims with 'a minimal causal connection or

14  incidental relation'" to the noted actions or allegations.  *L.A. Lakers*, 869 F.3d at 801 (citations

15  omitted).  "Arises from" means the claim "originat[es] from, ha[s] its origin in, grow[s] out of, . . .

16  flow[s] from, . . . [is] incident to, or ha[s] connection with" something else.  *Id.* (citations omitted).

17  "It is settled that this language does not import any *particular* standard of causation or theory of

18  liability into an insurance policy."  *Assoc'd Indus. Ins. Co., Inc. v. Mt. Hawley Ins. Co.*, 309 F.

19  Supp. 3d 812, 816 (N.D. Cal. 2018) (emphasis added) (quoting *Acceptance Ins. Co. v. Syufy*

20  *Enters.*, 69 Cal. App. 4th 321, 328 (1999)).  But California courts have clarified that *some* causal

21  connection is necessary, though a broad interpretation of causation is all that is required.

22  *Acceptance Ins. Co.*, 69 Cal. App. 4th at 328-30; *see also Fireman's Fund Ins. Co. v. Discover*

23  *Prop. & Cas. Ins. Co.*, No. C 08-03079 WHA, 2009 WL 2591394, at *3 (N.D. Cal. Aug. 21, 2009)

25  [9] Foster argues that because Everest has a duty to defend, it must defend claims that are even *potentially* covered by the policy and so it has the burden to show no claims are even potentially covered.  P. Mot. 9:19-11:23.  It is not clear that the plain language of the Policy provides for a duty to defend in addition to the clear duty to advance costs, though Everest does not contest this directly.  However, because I find that the SME does not preclude coverage of the Turkey Antitrust Suits, the specific burden does not affect the outcome of the case, and I do not address it further.

1   ("Although the phrase 'arising out of' should be broadly read to require only a minimal causal

2   connection, it requires more than 'but for' causation." (citation omitted)).

3          In California, the clause "based upon" is given "the same broad reading as 'arising out

4   of.'" *L.A. Lakers*, 869 F.3d at 801 (citation omitted).  And given the similarities between the plain

5   meanings of these terms and "attributable to," *see Hartford Cas. Ins. Co.*, 326 P.3d at 259 (looking

6   first to the plain meaning of a provision when interpreting insurance contracts), it is logical that

7   this provision too is given a similarly broad reading.

8          Here, the policy language is not ambiguous because it clearly excludes from coverage

9   claims that arise from, are based upon, or are attributable to the Chicken Antitrust Suits, including

10  any facts, circumstances, acts, or omissions alleged in those suits.  *See L.A. Lakers*, 869 F.3d at

11  801 (reaching a similar conclusion).  That means that the SME precludes coverage of any claim

12  that originates from, grows out of, flows from, is incident to, or has connection with the Chicken

13  Antitrust Suits and alleged wrongful acts.  *See id.*; *see also Crown Cap. Sec., L.P. v. Endurance

14  Am. Specialty Ins. Co.*, 235 Cal. App. 4th 1122, 1130-31 (2015) (same).

15         None of the claims in the Turkey Litigation Suits originate from, grow out of, flow from,

16  are incident to, or have sufficient *causal* connection with the claims, facts, circumstances, acts, or

17  allegations in the Chicken Antitrust Suits.  *See Fireman's Fund*, 2009 WL 2591394, at *3

18  (affirming the requirement of a causal connection).  For example, in *Acceptance*, the court

19  reasoned that an individual's injury arose out of the work he was performing to repair a roof where

20  he was injured while leaving the job site through a roof hatch, because the job could not have been

21  done without passing through the hatch.  69 Cal. App. 4th at 328-29.  The court explained that

22  relationship between the injury and the job performed was "more than incidental."  *Id.* at 328.  In

23  contrast in *Fireman's Fund*, the Honorable William Alsup reasoned that an injury did not "arise

24  out of" a bookstore's ownership, maintenance, or use of leased premises because the bookstore

25  "was not instrumental in any of the acts that led to the injury" and indeed had no connection to or

26  control over the injury itself, which occurred at a temporary construction site nearby.  2009 WL

27  2591394, at *4.  Accordingly, there was "neither a causal connection nor incidental relationship."

28  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Here, the allegations in the Turkey cases are independent from the facts and circumstances

2 of the Chicken cases.  It is true that both cases contain allegations of using Agri Stats reports to

3 conspire with competitors, with the goal of coordinating production suppression to decrease

4 supply.  But unlike in *Acceptance*, the alleged activities in the Turkey cases could have occurred

5 regardless of the alleged activities in the Chicken cases—there is nothing to indicate that the

6 alleged anticompetitive in the chicken market *caused* similar anticompetitive behavior in the

7 turkey market, particularly given that different individuals received the Agri Stats reports and were

8 responsible for making market-related decisions.[10]  *Compare* DPC ¶ 102; IPC ¶ 112 (CEOs and

9 CFOs) *with* Olean ¶¶ 13-15, 19 (sales and financial personnel as well as executives).  Both suits

10 allege that chicken and turkey are not easily substituted, making it unlikely that changes in one

11 market would affect customers in the other.  *See* DPC ¶ 255; IPC ¶ 265; Olean ¶ 106; Sandee's

12 ¶ 105.  There are no allegations, and the parties do not contend, that the decision makers for turkey

13 production were at all influenced by what they did or saw in the chicken market.  Indeed, as in

14 *Fireman's Fund*, there is nothing to suggest that the actors in either market had any control over

15 the actions, choices, or circumstances in the other market.  Consequently, the Turkey Antitrust

16 Claims do not arise from, are not based upon, and are not attributable to the Chicken Antitrust

17 Claims.

18    This finding aligns with findings by other federal courts that have analyzed similar policy

19 language under California law.  For example, the court in *Millennium Laboratories, Inc. v. Allied*

20 *World Assurance Co. (U.S.), Inc.*, found that a policy provision excluding coverage for "any

21 Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any

22 way involving" certain prior lawsuits did preclude coverage for a subsequent government

23 investigation and lawsuit involving "exactly the same allegations" as those prior suits.  165 F.

24 Supp. 3d 931, 934-35 (S.D. Cal. 2016), *aff'd*, 726 F. App'x 571 (9th Cir. 2018) (emphasis

25 omitted).  Here, while many of the allegations in the turkey and chicken suits seem similar at first

26

27    [10] It is true that the Turkey Antitrust Suits assert that the alleged production cuts in the turkey
   market ceased once the Chicken Antitrust Suits were filed, but that merely asserts that the chicken
28 suits had a role in *stopping* the alleged anticompetitive behavior, not that the chicken suits caused
   the unlawful acts or resulting injuries.

blush, they involve different acts, actors, decisions, markets, timing, and consequences. As discussed further below, they also involve different courses of conduct, different goals, and different resulting injuries. Consequently, they are unlike the allegations in *Millennium Laboratories* which were—literally—the same allegations.

In many ways the question here parallels that presented in an older Ninth Circuit case, *Eureka Federal Savings & Loan Association v. American Casualty Co. of Reading, Pennsylvania*, 873 F.2d 229, 234 (9th Cir. 1989). There, an insurance policy provided a $20 million limit for a single loss per year, and a $20 million limit per officer and director per year, but clarified that "[c]laims based on or arising out of the same act, interrelated acts, or one or more series of similar acts, of one or more Directors or Officers shall be considered a single loss." *Id.* The insurer argued that losses stemming from one case constituted a single loss under the policy because they resulted from a single concerted strategy implemented by the insured to achieve a particular outcome—"revers[ing] chronic operating losses." *Id.* But the Ninth Circuit reasoned that the losses were separate events and did not arise from (or relate to, *see infra* Part II.C) the same act, despite originating from that single concerted strategy, because "numerous intervening business decisions . . . took place after" the strategy was initiated which "required the exercise of independent business judgement." *Id.* at 235. Those independent business decisions caused the losses, not the underlying strategy itself. *Id.*

Here, the use of Agri Stats to coordinate with other producers and decrease production to increase prices parallels the concerted strategy and desired outcome in *Eureka*. But despite apparent similarities, each strategy ultimately involved different acts and business decisions based on different markets, different actors, different purchasers, and, of course, different products. While Everest argues that the claims in *Eureka* were "far more diverse" than those here, D. Mot. 16:14-27, the point of that case was that the independent business decisions were what led to the alleged injuries, not the underlying strategy itself. Indeed, the reports alleged in the Chicken Antitrust Suits did not give rise to any liability in the Turkey Antitrust Suits, and the alleged conferences and trade association meetings in the chicken cases did not cause the alleged unlawful behavior in the turkey cases. Accordingly, as in *Eureka*, the Turkey claims do not arise from and

17

are not based upon the Chicken claims.

**B.  The Same or Substantially the Same**

Next, I turn to whether the Turkey Antitrust Suits allege "the same or substantially the same Wrongful Acts, Interrelated Wrongful Acts, facts, circumstances or situations underlying or alleged in" the Chicken Antitrust Suits.  Policy, Endorsement No. 15.  As used in the provision, an interrelated act is a "fact, circumstance, act or omission alleged" in the Chicken Antitrust Suits or any wrongful act that is the same as or similar to wrongful acts in the chicken suits.  *Id.*, Endorsement Nos. 15, 17.

Again, I first assess whether the provision is ambiguous.  *See Pension Tr. Fund*, 307 F.3d at 950.  It is not: it clearly precludes coverage for claims that are "the same or substantially the same" as the claims, acts, facts, circumstances, situations, or omissions in the Chicken Antitrust Suits.  Accordingly, I turn to the plain meaning of the provision.  *See Hartford Cas. Ins. Co.*, 326 P.3d at 259.

A layperson would not define the chicken and turkey suits as "the same."  *See id.* at 288.  As noted, and despite Everest's contention that "the only distinction" between the suits is "the type of poultry involved," D. Mot. 13:24-25, the allegations involve different products, different markets, different reports, different time periods, and different acts taken to decrease production.[11] There are also no allegations that the acts in one market caused the acts in the other market, or that the impact of the alleged anticompetitive behavior in either market affected the other market.  To Everest's point, numerous allegations are similar at a high-level: an alleged conspiracy to decrease production through use of Agri Stats reports, vertically integrated and inelastic markets, causes of action under the Sherman Act, and, of course, poultry.  But despite these high-level similarities, a layperson would not understand these two sets of lawsuits—particularly given their very different alleged details—to be "the same."  That conclusion is clear from the plain meaning of the text, and

---

[11] Everest asserts that the only relevant question is whether the "wrongful acts" alleged in each suit are the same or similar, and the comparison of the markets is irrelevant.  D. Oppo. 6:15-28.  First, I do consider whether the acts are the same or similar.  Second, the plain language of the provision refers to facts, circumstances, acts, or omissions, and so it is proper for me to also consider allegations beyond merely the "acts."

1  no further analysis is needed.

2         The two sets of suits are also not "substantially the same" given the term's plain meaning.

3  *See Hartford Cas. Ins. Co.*, 326 P.3d at 259.  Again Everest argues that the allegations in the

4  Turkey Antitrust Suits are substantially the same as those in the Chicken Antitrust Suits because

5  they both allege that Foster used the same type of data from the same source with the same goal of

6  curtailing production, and that the turkey suits specifically referenced the Agri Stats data in the

7  chicken suits.  D. Mot. 12:24-13:20.  To be sure, these appear similar at a high level—but as

8  noted, the details of the modus operandi differed.  The alleged production cuts took different

9  forms—in the chicken suits, Foster allegedly broke eggs, exported and destroyed breeder hens,

10  killed chicks, limited processing plant capacity, and reduced purchases of breeder hens, DPC

11  ¶¶ 116-17, 214, while the turkey suits state only that the defendant integrators were able to

12  exercise a remarkable level of industry-wide restraint in keeping the growth of turkey supply in

13  check" over the conspiracy period, Olean Suit ¶¶ 20, 108—and the actions occurred at different

14  times, with Foster allegedly colluding with different actors (turkey producers as opposed to

15  chicken producers), impacting different markets.  The two sets of lawsuits also do not allege that

16  the production cuts in each market affected the same product or buyers, occurred at the same

17  facilities, or caused the same results.  Consequently, the plain meaning of this provision does not

18  preclude coverage for the Turkey Antitrust Suits.[12]

19     **C. In Any Way Related Directly or Indirectly, in Whole or in Part**

20         Finally, I assess the ambiguity of the SME provision excluding claims that are "in any way

21  

-------

22  [12] It appears that one of the only California cases to define "substantially the same" in insurance contract interpretation arose in a very different factual context.  *See State Farm Fire & Cas. Co. v.*

23  *Elizabeth N.*, 9 Cal. App. 4th 1232 (1992).  In *State Farm*, the court reasoned that multiple acts of negligence were "substantially the same" where the insured repeatedly failed to care for and

24  supervise a child, and the child suffered repeated injury because of nearly identical repeated acts. *Id.* at 1237-38.  The court contrasted a prior case where individual customers each suffered a

25  single injury from a single act—serving contaminated food—and that court had found those acts of serving were not "substantially the same." *Id.* at 1237 (citing *Mason v. Home Ins. Co. of Ill.*,

26  177 Ill. App. 3d 454, 126 Ill. Dec. 841, 844, 532 N.E.2d 526, 529 (1988)).  Though these cases are factually distinct, they support my finding because the alleged acts in the turkey and chicken

27  markets—including communicating with different producers, taking actions at different facilities, receiving reports with different data, and impacting the production of different products—more

28  closely align with the distinct acts of serving different contaminated food in *Mason* rather than the repeated identical acts of failing the supervise in *State Farm*.

United States District Court
Northern District of California

United States District Court
Northern District of California

related directly or indirectly, in whole or in part, to" an interrelated act, defined as a "fact, circumstance, act or omission alleged" in the Chicken Antitrust Suits or any wrongful act that is the same as or similar to wrongful acts in the chicken suits. Policy, Endorsement No. 15; *see Pension Tr. Fund*, 307 F.3d at 950. If it is not ambiguous, I assign to the provision its plain meaning, *Hartford Cas. Ins. Co.*, 326 P.3d at 259, based on the parties' mutual intent, *L.A. Lakers*, 869 F.3d at 801.

As a preliminary matter, although the parties disagree over the scope of this provision, their arguments do not indicate the provision is ambiguous.[13] In *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Insurance Co.*, 5 Cal. 4th 854, 868-69, 855 P.2d 1263, 1271-72 (1993), the California Supreme Court explained that courts must ask whether a "word is ambiguous in the context of *this* policy and the circumstances of *this* case" and then determined that the word "related" was not ambiguous in that case despite its potential for multiple meanings. The court reasoned that "related" was a broad word, encompassing both logical and causal connections, but that did not render the term ambiguous in the context of that policy. *Id.* at 1274-75. That reasoning applies to this case. With respect to *this* Policy, the SME precludes coverage of claims related to facts, circumstances, acts, omissions, or wrongful acts in the Chicken Antitrust Suits, which means any claims that are logically or causally related. *See id.* That this provision is broad does not render it ambiguous; indeed, the language is clear, especially because it is modified by the Chicken Antitrust Suits and is contextualized by the broader Policy provision for general antitrust coverage. Accordingly, the Policy precludes coverage of claims related to the Chicken Antitrust Suits. This is not ambiguous.

Consequently, the plain meaning of "related" applies here to effect the parties' mutual intent. Under California law, the plain meaning of "related" encompasses both causal and logical connections. *See Bay Cities*, 855 P.2d at 1271, 1274; *see also Fin. Mgmt. Advisors, LLC v. Am. Int'l Specialty Lines Ins. Co.*, 506 F.3d 922, 926 (9th Cir. 2007) (noting with approval the logical

---

[13] In its motion, Foster argues that "[a]t a minimum, the Specific Matter Exclusion is ambiguous and must be construed in favor of coverage." P. Mot. 24:5-6. But Foster's argument on this point is actually focused on the separate question of whether the SME is "plain and clear."

and causal connection explained in *Bay Cities*).  Because there are no allegations, claims, facts, or other circumstances that suggest anything in the Chicken Antitrust Suits *caused* the actions and facts alleged in the Turkey Antitrust Suits, I focus on whether there is a logical connection between the two.  In reviewing many California and federal cases interpreting the word "related," the Honorable Edward Chen emphasized that different acts are "logically related" when they are "part of a single course of conduct or a single plan."  *Liberty Surplus Ins. Corp. v. Samuels*, 562 F. Supp. 3d 431, 441-41 (N.D. Cal. 2021).  The Ninth Circuit has also noted the importance of different acts causing "the same injury" when finding claims are logically related, and that acts causing "separate" or "independent" losses may not be related.  *Fin. Mgmt. Advisors*, 506 F.3d at 926.

Though the parties cite no cases with parallel facts and circumstances that define "related" in an exclusionary provision, and I could find no such cases, many courts throughout California and this circuit have analyzed the word "related" in the insurance context and all provide insight to assess the term's plain meaning here.  The cardinal California case addressing the word "related" is *Bay Cities*, in which the California Supreme Court found that two different acts were "related" as provided in the relevant insurance policy where an attorney made two independent errors that led to one injury for one client.  855 P.2d at 873.  Although neither error caused the other, the court reasoned that the acts were related because they "arose out of the same specific transaction," happened to the same client, were "committed by the same attorney," and resulted in the same injury, so "[n]o objectively reasonable insured . . . could have expected" the claims to constitute unrelated acts given the policy language.  *Id.* at 1275.

Similarly, in *Liberty Surplus*, 562 F. Supp. at 435-36, a client hired a law firm to seek damages from a construction company that reneged on promises and left the client with a defective final project.  That law firm initiated four separate lawsuits, all with the goal of obtaining compensation for its client due to the defective construction—a collection action, an indemnity action, one related to the construction company's bankruptcy proceedings, and one against a third-party manufacturer.  *Id.* at 436.  Most of these did not pan out for the client, and the client sued its law firm for malpractice, ultimately securing an award of $4.2 million.  *Id.* at 436-37.  The law

firm's insurer, Liberty Surplus, noted the $2 million per claim limit in its insurance policy, but the client asserted that each of the four underlying lawsuits constituted four separate claims because they were four separate instances of attorney misconduct.  *Id.* at 434, 442-43.  Judge Chen disagreed and found that at least two of those suits arose from "related acts" and so constituted a single claim under the relevant policy because they were "part of a single course of conduct or a single plan"--to obtain compensation for the client from the insurance defects.  *Id.* at 442-43.

The present case differs from *Bay Cities* and from *Liberty Surplus*.  The attorney in *Bay Cities* caused one injury through two errors and the law firm in *Liberty Surplus* sought one outcome across four lawsuits.  Here, the Chicken Antitrust Suits allege that chicken purchasers were injured and that Foster acted to increase profits in the chicken market, and separately and distinctly the turkey suits allege that turkey purchasers were injured and that Foster acted to increase profits in the turkey market.  Both suits assert that the products are inelastic and that purchasers of each product either do not or cannot switch to other products, DPC ¶¶ 114, 252, 255; IPC ¶¶ 124, 262, 265; Olean Suit ¶ 106; Sandee's Suit ¶ 105; Gnemi Suit ¶ 102—meaning the chicken-related injuries are wholly unrelated to the turkey-related injuries in that they did not cause, could not prevent, and were therefore not connected to the other.  Consequently, the two alleged courses of conduct—the use of Agri Stats to conspire and increase profitability in the chicken market and in the turkey market—did not cause a single injury and were not motivated by a single goal.  They are not related under the reasoning in these cases.

The parties also cite cases that analyzed whether lawsuits against investment advisors were "related."  In *Financial Management Advisors*, the Ninth Circuit addressed two underlying lawsuits where former clients alleged that the insured made misrepresentations to induce those clients into making certain investments.  506 F.3d at 924-25.  The alleged misrepresentations were made by the same financial advisor and concerned at least one of the same investment products, but the Ninth Circuit held the suits were not "related" under the relevant insurance policy.  *Id.* at 925-26.  The court reasoned that the cases concerned unrelated investors with unique investment objectives who were advised on separate dates, and that despite the similar allegations concerning the investment products, "[m]ore important[]" were the different wrongful acts alleged by the

suits, including that one asserted the misrepresentations were based on failure to disclose information and the other asserted the misrepresentations were based on affirmative written statements. *Id.* at 925-26. The opinion specifically distinguished *Bay Cities*, noting that case involved a single injury caused by two acts and either act alone would have caused the injury, whereas *Financial Management Advisors* involved "separate" and "independent" losses. *Id.* at 926.

A court in the Central District reached a different conclusion when addressing whether multiple lawsuits were related in *Liberty Insurance Underwriters*, where one real estate firm and several specific named attorneys made similar false representations to investors that the sellers paid commissions while in reality the purchase price was marked up to include commissions. *Liberty Ins. Underwriters, Inc. v. Davies Lemmis Raphaely L. Corp.*, 162 F. Supp. 3d 1068, 1071-73 (C.D. Cal. 2016), *aff'd*, 708 F. App'x 374 (9th Cir. 2017). Though all alleged misrepresentations were made under the guise of helping investors avoid capital gains liability through participation in a "section 1031 'like-kind exchange,'" the investments themselves were made by different entities on different dates and under different terms. *Id.* at 1071, 1073. The court found the lawsuits were related because they "all allege[d] the same misrepresentations and omissions . . . in the same form relating to similar or identical investments and properties" and because the acts all arose from "a single course of conduct, a unified policy of making alleged affirmative misrepresentations to investors in order to induce them to invest in commercial real estate." *Id.* at 1078. The court distinguished *Financial Management Advisors* by explaining that that case involved "different types of wrongdoing related to different types of investments" while the case at hand involved "similar or identical acts of wrongdoing which were part of a general course of conduct aimed at the same goal of inducing investors to participate in transactions related to section 1031 like-kind exchanges." *Id.* at 1079.

The present case more closely parallels *Financial Management Advisors*. Like that case, here there are different underlying products—chicken and turkey, paralleling the different investment products—and the alleged wrongful acts are distinct. While the chicken suits allege that chicken producers broke eggs, destroyed breeder hens, limited processing plant capacity, and

exported chicks, DPC ¶¶ 116-17; IPC ¶¶ 126-27, the turkey suits assert that the turkey producers decreased turkey supply by "exercis[ing] . . . industry-wide restraint" and engaging in certain coordinated production cuts.  Olean Suit ¶¶ 20, 108; Sandee's Suit ¶¶ 20, 107; Gnemi Suit ¶¶ 20, 104.  *Financial Management Advisors* distinguished between allegations of affirmative misrepresentations versus failure to disclose, while here the chicken suits assert many specific affirmative acts related to production cuts but the turkey suits—to the extent they offer specifics—focus on "restraint."  These are different wrongful acts, involving different products.  And unlike *Liberty Insurance*, where specific attorneys carried out the misrepresentations, here Foster provides evidence that the actions in each set of suits would have been carried out by different employees or executives.  *See* Feeny Decl. ¶¶ 16, 19.  The chicken suits also allege specific acts of collusion at Agri-Stats conferences, like confirming identities of competitors, DPC ¶ 103; IPC ¶ 113, while the turkey suits seem to assert that the industry conferences and councils involved anticompetitive behavior distinct from Agri-Stats, Olean ¶¶ 127-29.  These are also different acts.  And while it is true that both sets of suits assert that Foster affirmatively used Agri Stats reports to coordinate production changes, given the reasoning in *Financial Management Advisors* and *Liberty* Insurance *Underwriters*, those are not related acts, facts, or circumstances because they concerned different products.

Finally, the parties both cite to *Eureka*, 873 F.2d 229, which despite its age is most factually similar to the present case.  There the Ninth Circuit assessed whether different insurance claims arose from the same act or were sufficiently related so as to be considered a single loss.  *Id.* at 234.  Underlying the case were multiple lawsuits alleging that the insured's former officers breached their fiduciary duties to clients, and the court reasoned that even though all alleged breaches of duty arose from a single strategy—a particularly aggressive lending policy designed to "reverse chronic operating losses"—the claims were not related because "there were numerous intervening business decisions that took place after the loan policy was initiated that required the exercise of independent business judgment."  *Id.* at 231, 234-35.  Indeed, it was not "the decision to implement the aggressive loan policy" that caused the losses but rather the officers' alleged negligence in making or approving the individual transactions.  *Id.* at 235.

United States District Court
Northern District of California

The reasoning in *Eureka* explains that even if the use of Agri Stats to increase profitability constitutes the same general course of conduct with the same goal (it does not), the claims are not related where they involve many intervening decisions made after the single strategy or policy is implemented.  873 F.2d at 234-35.  As in *Eureka*, here there are allegations of separate and unique business decisions made after the Agri Stats data was used.  Especially salient are the allegations about *how* production was decreased: in the chicken market, it was by destroying eggs, exporting breeder hens, and decreasing purchase of new chickens from genetics companies to hinder production in the long term.  DPC ¶¶ 116-17, 165; IPC ¶¶ 126-27, 175.  Not only are these allegations unique to the chicken market and made only in the chicken suits, but also it is not clear whether any of these actions could be taken in the turkey market or whether they would have the same effect on the market.  *See generally* Feeny Decl. (explaining differences in Foster's approach to marketing, pricing, supply, and production in each market).  Additionally, the turkey suits allege that turkey producers conspired at some conferences apparently separate and apart from their use of Agri-Stats, *see* Olean ¶¶ 127-29, which is distinct from the allegations in the chicken cases.  As in *Eureka*, then, here it is not the receipt of Agri Stats reports that caused the alleged injuries but rather the decreased production—resulting from different business decisions—that was what ultimately increased prices for purchaser-plaintiffs.  Where the decreases to production themselves are distinct and result from independent business decisions, the claims are not related.  *See Eureka*, 873 F.2d at 234-35.

Importantly, I consider the plain meaning and definition of "related" in a broad sense and in the context of the policy as a whole.  *See Minkler*, 232 P.3d at 616.  What Everest seems to request is to look beyond the clear language and read into the SME a provision that excludes any claims where Foster is sued for its use of Agri Stats data in production decisions.[14]  But that is not what the SME says, despite both parties having the opportunity to add or adjust language.  Indeed,

[14] Everest points out that it agreed to provide coverage of the *Jien* suit, which includes allegations about Foster's use of Agri Stats.  *See* D. Oppo. 13:5-14:7.  While Everest is correct that this shows it does not read the SME to exclude all claims at all related to Agri Stats, this does not further Everest's argument here because, of course, the SME does not have language that implies it excludes all claims related to Agri Stats.  Rather, it precludes coverage of claims "related" to the Chicken Antitrust Suits.

1    that interpretation would conflict with the Policy's broad provision for general antitrust coverage,

2    which does not exclude particular kinds of antitrust cases or modus operandi besides the wrongful

3    acts listed in the SME.  *See* P Mot. 12:10-13:10.

4         I note too that a layperson would not understand the two sets of lawsuits to be "related."

5    *See Hartford Cas. Ins. Co.*, 326 P.3d at 259.  At the most basic level, no layperson would think

6    that chicken and turkey are related.  Though both lawsuits allege the use of Agri Stats reports to

7    conspire with competitors, they are related only in that both involve poultry—and a layperson,

8    reading the provision in the context of the Policy as a whole, *see Minkler*, 232 P.3d at 616, would

9    not read the provision precluding coverage of claims "related" to the chicken suits as applying to

10   claims concerning turkey because the Policy does not specify poultry, Agri Stats, or even

11   conspiracies.

12        Accordingly, I find that the Turkey Antitrust Suits are not related to the Chicken Antitrust

13   Suits given the term's construction in the policy.

14   **III.    EVEN IF THE PROVISION WERE AMBIGUOUS**

15        Finally, even if the language were ambiguous—it is not—the interpretation would favor

16   Foster.  Exclusion clauses with ambiguous language are "interpreted narrowly against the insurer."

17   *Minkler*, 232 P.3d at 617; *Kunde Enters.*, 608 F. Supp. 3d at 892.  As discussed, even broad

18   readings of the "arising out of" and the "related" language show the Turkey Antitrust Suits are not

19   excluded.  Any interpretation of "same" or "substantially the same" does not extend to include

20   different lawsuits arising out of different acts and decisions, made by different industry actors,

21   influenced by different Agri Stats reports, with different goals.  And a narrow interpretation of

22   "related" emphasizes that, despite apparently similar modus operandi, the wrongful acts and

23   affected products are sufficiently different so as to render the cases unrelated.

24        Additionally, exclusion clauses with ambiguous language are interpreted "to protect the

25   objectively reasonable expectations of the insured."  *Minkler*, 232 P.3d at 616; *see also In re K F*

26   *Daires, Inc. & Affiliates*, 224 F.3d 922, 926 (9th Cir. 2000) (same).  Here, it was objectively

27   reasonable for Foster to expect that the SME would not preclude coverage for a separate set of

28   antitrust suits given the many differences between the suits—particularly the different alleged

United States District Court
Northern District of California

26

United States District Court
Northern District of California

goals and acts taken to decrease production—both because Everest's chosen language in this section of the SME provision did not clearly exclude coverage based on poultry or use of Agri-Stats and because Foster intentionally sought out a policy providing coverage for future antitrust threats. *Cf. Liberty Surplus Ins.*, 562 F. Supp. 3d at 442 (finding there was "evidence that an objectively reasonable insured would have expected" the claims to be related). This expectation is reasonable particularly viewing the policy "as a whole, and in the circumstance of th[is] case." *Bay Cities Paving*, 5 Cal. 4th at 867. Consequently, even if the language were ambiguous, the proper interpretation of the SME does not preclude coverage of the Turkey Antitrust Suits.

A few other arguments merit discussion.[15] First, while the Illinois district court's denial of the motion to relate these cases is well-reasoned, it was conducted for different reasons, under a different standard, and applying different legal rules, and so I do not rely on that reasoning in this Order. The same is true of the case *Perdue Farms, Inc. v. National Union Fire Insurance Co. of Pittsburg, PA*, 517 F. Supp. 3d 458 (D. Md. 2021). The district court in Maryland did not apply California contract law, so its thorough analysis is not applicable here.

Finally, the SME is not rendered meaningless, as Everest asserts, by this Order. *See* D Mot. 19:1-20:15. Merely because *these* lawsuits are not covered by the provision does not mean other claims beyond those stemming directly from the Chicken Antitrust Suits would not be covered. Indeed, this Order clarifies how claims "related" to the chicken suits are broader than just those directly arising from the chicken suits, which inherently gives meaning to both the SME and the prior written notice provision. For the same reason, the policy section precluding claims that were "based upon, arising out of, or attributable to any fact, circumstance or Wrongful Acts which have been the subject of any written notice" is not rendered illusory by this interpretation of the SME. *See* Policy, Exclusions § IV, as modified by Endorsement No. 17. That section clearly excludes claims from the Chicken Antitrust Suits (and other wrongful acts outlined in the SME) but as described, the SME provides a broader exclusion than that provision, even though it does

---

[15] Everest argues in part that some of Foster's evidence impermissibly provides legal conclusions and should not be considered. D. Oppo. 5:19-8. To the extent that these documents provide legal conclusions rather than facts, I have not considered them in this Order.

1   not exclude the turkey claims.

2        Accordingly, Everest has failed to show that the SME precludes coverage of the Turkey

3   Antitrust Suits.[16]

4   **CONCLUSION**

5        For those reasons, Foster's motion is GRANTED and Everest's motion is DENIED.  It is

6   DECLARED that the Policy does not preclude coverage of the Turkey Antitrust Suits and that

7   Everest has a duty to reimburse past costs and an ongoing obligation to defend the suits up to the

8   Policy limit.

9        This resolves all of the issues in this case.  Foster is directed to prepare a proposed form of

10   Judgment and to file it by May 1, 2023, after seeking Everest's approval as to form.  If there is any

11   disagreement regarding the form of the Judgment, the parties may submit a joint letter of no more

12   than four pages explaining the disagreement.

13        **IT IS SO ORDERED.**

14   Dated: April 24, 2023



William H. Orrick
United States District Judge

---

[16] Foster does not move for summary judgment on its breach of contract claim, which is mooted by this Order.

28